Ryan P. Steen, AK Bar No. 0912084
Jason T. Morgan, AK Bar No. 1602010
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington 98101
(206) 624-0900 (phone)
(206) 386-7500 (facsimile)

Connor R. Smith, AK Bar No. 1905046
Stoel Rives LLP
510 L Street, Suite 500
Anchorage, Alaska 99501
(907) 277-1900 (phone)
(907) 277-1920 (facsimile)

*Attorneys for United Cook Inlet Drift Association and
Cook Inlet Fishermen's Fund*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED COOK INLET DRIFT ASSOCIATION and COOK INLET FISHERMEN'S FUND,<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; GINA RAIMONDO, in her official capacity as the United States Secretary of Commerce; JANET COIT, in her official capacity as Assistant Administrator, National Oceanic and Atmospheric Administration; and JON KURLAND, in his official capacity as NMFS Alaska Region Administrator,<br><br>        Defendants. | Civil Action No.: _____<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF, AND PETITION FOR REVIEW (42 U.S.C. § 4332; 16 U.S.C. §§ 1801-1891d; 5 U.S.C. §§ 553, 701-706)** |

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

## INTRODUCTION

1. Plaintiffs have a related action pending in *United Cook Inlet Drift Association, et al., v. National Marine Fisheries Service*, *et. al.*, No. 3:21-cv-00255-JMK. Plaintiffs respectfully request that this Court consolidate this action, pursuant to Federal Rule of Civil Procedure 42, with Plaintiffs' pending case because the actions involve common questions of law and fact.

2. This case is the most recent chapter in a more-than-a-decade-long attempt by Plaintiffs to get Federal Defendants to stop shirking their duty to prepare a lawful Fishery Management Plan ("FMP") amendment for the Cook Inlet salmon fishery. Although Plaintiffs have repeatedly prevailed in this Court, Federal Defendants have continued to ignore their statutory duties in favor of deferring to the State of Alaska. At some point, enough is enough. This litigation has past that point.

3. As discussed more fully below, like its predecessors, Amendments 12 and 14, Amendment 16 to the FMP and its implementing regulations are arbitrary, capricious, and contrary to the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA" or "Magnuson-Stevens Act"), 16 U.S.C. §§ 1801-1891d; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706. In Amendment 16, the National Marine Fisheries Service ("NMFS") has, once again, found another way to try and continue to defer to Alaska's historic management practices, even as commercial harvests continue to dwindle. For the reasons discussed below, Plaintiffs respectfully request that

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
2
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 2 of 35

this Court vacate the decision approving Amendment 16 and its implementing regulations. Plaintiffs seek an order requiring NMFS to comply with the MSA and develop an appropriate FMP that covers the "fishery." Plaintiffs request that the Court declare that Amendment 16 and its underlying implementing regulations and NMFS's NEPA Finding of No Significant Impact ("FONSI") are arbitrary, capricious, and an abuse of discretion; not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations. Plaintiffs further seek an order vacating Amendment 16 and its underlying implementing regulations and the FONSI, and remanding to Defendants under the prescriptive supervision of this Court as set forth in the Request for Relief below.

## **PARTIES**

### **Plaintiffs**

4.      Plaintiff United Cook Inlet Drift Association ("UCIDA") is a corporation in good standing registered under the laws of the State of Alaska. UCIDA represents the economic, social, and political interests of drift gillnet fishermen and their families in Cook Inlet, Alaska. UCIDA currently has approximately 200 members who hold limited-access salmon driftnet fishing permits, issued by the State of Alaska, in Cook Inlet. UCIDA membership ranges across 27 different states and one foreign country.

5.      UCIDA's members make their living by commercial fishing. UCIDA's members hold State of Alaska limited-entry permits (meaning additional permits can no longer be issued and are fully allocated), which authorize them to catch all five species of salmon: sockeye, coho, chinook, chum, and pink.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

6.     Drift gillnet boats are small-scale fishing operations, typically crewed by one to three persons.  Each fishing operation represents a substantial investment in the boat, gear, and the permit itself.  Each boat is generally allowed to deploy a single 900-foot-long gillnet.  The gillnet is suspended in the water column by floats (called "corks") as the boat drifts with the current—hence the name "drift gillnet."  After the gillnet is allowed to "soak" in the water for a length of time (as the boat and net drift with the current), the gear is hauled in, and the fish are removed and placed on ice in the boat's hold.  Those fish are then transported to, and offloaded at, one of Cook Inlet's local seafood processors in fishing communities such as Kenai, Kasilof, Ninilchik, or Homer.  After processing, these salmon are delivered throughout the United States and around the world.

7.     In addition to permit holders, UCIDA has approximately 30 associate members, including fish processors, gear suppliers, crew members, and other interested members of the community.

8.     UCIDA's mission is to promote public policy that facilitates the science-based and orderly harvest of Cook Inlet salmon in a manner that is economically and ecologically sustainable and that protects commercial salmon fishing in Cook Inlet as a viable way of life.  UCIDA and its members are committed to the protection of the environment of Cook Inlet, and to ensuring that its marine resources are both managed and conserved to enhance the health and productivity of the ecosystem.  To that end, UCIDA has advocated in state and federal forums for management of these salmon

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
4
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK    Document 1    Filed 05/29/24    Page 4 of 35

stocks in a manner consistent with the goals and objectives of the MSA, including

management consistent with the MSA's Maximum Sustainable Yield ("MSY") principles

(MSY is defined at 50 C.F.R. § 600.310(e)(1)(i)(A) as the largest long-term average

catch or yield that can be taken from a stock or stock complex under prevailing

ecological, environmental conditions). The relief UCIDA seeks in this lawsuit is

germane to its organizational purpose.

9. Plaintiff Cook Inlet Fishermen's Fund ("CIFF") is a non-profit corporation

registered under the laws of the State of Alaska. CIFF has 446 members, including

commercial fishermen of all gear types, seafood processors, and community members.

The majority of CIFF's members are from Alaska, but CIFF also has members from 21

other states.

10. CIFF's mission is to advocate on behalf of all commercial fishermen of

Cook Inlet and for the coastal community more generally. CIFF's members and

volunteers are fueled by the desire to save the commercial fishing industry in Cook Inlet

as well as all of Alaska. The relief CIFF seeks in this case is germane to its

organizational purpose.

11. UCIDA and CIFF (collectively, "Plaintiffs"), directly or through their

members, fully participated, to the limited extent allowed by NMFS and the North Pacific

Fishery Management Council, in the proceedings predating the decisions challenged in

this lawsuit. Plaintiffs submitted detailed written comments and testimony on

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
5
123369004.1 0014655-00005

Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 5 of 35

Amendment 16 and its implementing regulations and the accompanying draft environmental assessment ("EA").

12.     Plaintiffs have standing to bring this action because their members are directly and adversely impacted by Amendment 16 and its implementing regulations, which improperly defer to the State of Alaska. Plaintiffs and their members are also adversely impacted by Defendants' failure to comply with the procedural requirements of NEPA and the MSA. The challenged agency decisions are final and ripe for review by this Court.

## Defendants

13.     NMFS is an agency of the National Oceanographic and Atmospheric Administration ("NOAA"), U.S. Department of Commerce. NMFS is sometimes referred to as "NOAA Fisheries." Among its duties, NMFS is responsible for managing commercial marine fisheries to ensure sustainable harvests that provide the greatest overall benefit to the nation pursuant to the MSA.

14.     Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce and is sued in her official capacity. Secretary Raimondo directs all business of the Department of Commerce, including NOAA and its agency, NMFS. Through these agencies, Secretary Raimondo is ultimately responsible for the approval of Amendment 16 and its implementing regulations, and the EA and corresponding FONSI, and is further responsible for the Department of Commerce's compliance with federal law, including NEPA, the MSA, and the APA.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

15. Defendant Janet Coit is the Assistant Administrator for NOAA Fisheries and is sued in her official capacity. The U.S. Secretary of Commerce ("Secretary of Commerce" or "Secretary") has delegated responsibility to the NOAA Administrator to ensure compliance with NEPA, the MSA, and the APA, and to promote effective management and stewardship of the nation's fisheries resources and assets to ensure sustainable economic opportunities. The NOAA Administrator, in turn, has subdelegated this responsibility to NMFS.

16. Defendant Jon Kurland is the Administrator of the NMFS Alaska Region and is sued in his official capacity.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. §§ 1855(f) and 1861(d) (MSA).

18. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1855(f).

19. Plaintiffs have exhausted all administrative remedies.

20. Venue is properly vested in this Court under 28 U.S.C. § 1391 because Plaintiffs' principal place of business is in this district, and a substantial part of the acts or omissions giving rise to this controversy occurred in this district.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
7
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 7 of 35

# STATUTORY FRAMEWORK

## The Magnuson-Stevens Fishery Conservation and Management Act

21.     The MSA is the primary domestic legislation governing management of federal fisheries.  16 U.S.C. §§ 1801-1891d.

22.     The MSA created eight regional fishery management councils that are primarily charged with preparing FMPs and plan amendments for each managed federal fishery.  *Id.* § 1852(a)(1).

23.     The MSA requires an FMP for each fishery under the regional council's jurisdiction "that requires conservation and management."  *Id.* § 1852(h)(1).  The FMP is the foundational document for management of each fishery and provides the framework for ensuring that fisheries are managed in a manner consistent with the requirements of the MSA and its 10 National Standards.

24.     The MSA's purpose is to put these national fishery resources under "sound management" and "to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(5)-(6).  This includes both conservation measures to prevent overfishing, as well as a "national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry." *Id.* § 1801(a)(7).

25.     The MSA gives special attention to anadromous species such as salmon. Indeed, the MSA's stated purpose is "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the *anadromous species* . . . of the United States."  *Id.* § 1801(b)(1) (emphasis added).

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

26.     The Council manages fisheries that fall under its authority.  Prior FMPs developed by the Council govern the management of salmon fisheries, including but not limited to the salmon fisheries in which Plaintiffs' members participate.

27.     The authority of a state to manage fisheries in the exclusive economic zone ("EEZ"), beyond the state's territorial waters (three miles for purposes of MSA), is constrained by the MSA.  The state may regulate all fishing activities in the adjacent portions of the EEZ only to the extent that the applicable FMP delegates such authority. *Id.* § 1856(a)(3).  Absent such delegation through an FMP, the state may only regulate vessels registered under the laws of that state in the EEZ.

28.     Fishery management councils submit proposed FMPs and FMP amendments to the Secretary of Commerce for review and approval.  *Id.* §§ 1853, 1854. All FMPs, and FMP amendments, must be consistent with the requirements of the MSA, including the 10 National Standards set forth in the MSA.

29.     The MSA's National Standards guide all FMPs and MSA regulations.  For example, National Standard 1 requires FMPs to prevent overfishing while achieving the OY from each fishery for the U.S. fishing industry.  *Id.* § 1851(a)(1).  National Standard 2 requires that all conservation measures be based on the best scientific information available.  *Id.* § 1851(a)(2).  National Standard 3 provides that fisheries should be managed as a unit throughout their range, where practicable.  *Id.* § 1851(a)(3).  National Standard 4 requires that any allocation of fishing rights be "fair and equitable" to fishermen and "shall not discriminate between residents of different States."  *Id.*

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

§ 1851(a)(4).  National Standard 7 requires conservation measures to, where practicable, minimize costs and unnecessary duplication.  *Id.* § 1851(a)(7).  National Standard 8 requires conservation measures to take into account the importance of the fishery resources to fishing communities, to provide for the sustained participation of, and to minimize impacts on, such communities.  *Id.* § 1851(a)(8).  National Standard 10 requires conservation measures to promote the safety of human life at sea.  *Id.* § 1851(a)(10).

30.    The Secretary of Commerce, acting through NMFS, must disapprove an FMP amendment to the extent it is inconsistent with provisions of the MSA or any other applicable law.

31.    The Secretary of Commerce must also approve all regulations that implement an FMP.  *Id.* § 1854(b).  The Secretary must give notice of proposed rulemaking and provide an opportunity for public comment on proposed regulations.  *Id.*

32.    Any fishery management regulation implementing an FMP must be consistent with the MSA, including the 10 National Standards for fishery management and conservation.  *Id.* §§ 1854(b), 1851(a).

### The National Environmental Policy Act

33.    Approvals of FMPs, FMP amendments, and implementing regulations are subject to NEPA requirements, 42 U.S.C. § 4321 *et seq.*; 16 U.S.C. § 1854(i).

34.    Congress established NEPA as "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a) (1978) (amended July 16, 2020).  NEPA and its implementing regulations require that federal agencies, including NMFS, must prepare an

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
10
123369004.1 0014655-00005

Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 10 of 35

environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1501.3–.6 (2020). The purpose of NEPA is to ensure that federal decision-making is fully and publicly informed through a reasonably thorough and thoughtful analysis of the probable environmental impacts resulting from a proposed federal action, and through identification and analysis of a reasonable range of alternative actions, including the no-action alternative. In enacting NEPA, Congress sought to ensure that federal agencies take a hard look at the environmental consequences of any proposed action and required agencies to comply with NEPA "to the fullest extent possible." 42 U.S.C. § 4332.

35.    NEPA requires that a federal agency proposing a major federal action with significant environmental effects prepare a detailed statement, which must include the environmental impacts of and alternatives to the proposed action. *Id.* § 4332(2)(C)(i)-(iii). This detailed written statement is an EIS. *See* 40 C.F.R. § 1508.1(j) (2020).

36.    To determine whether an EIS is necessary, an agency may first prepare an EA. *See id.* §§ 1501.5(a)–(c), 1508.1(h) (2020). An EA is a "concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an [EIS] or a [FONSI]." *Id.* § 1508.1(h) (2020). An EA must contain sufficient information and analysis to determine whether the proposed action is likely to have significant impacts, thus requiring preparation of an EIS. *See id.* §§ 1501.5(a)–(c), 1508.1(h) (2020). An EA must consider a reasonable range of

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
11
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK    Document 1    Filed 05/29/24    Page 11 of 35

alternatives and must include a reasonably thorough discussion of the direct, indirect, and cumulative impacts of the proposed alternative. *See* § 1501.5(c)(2) (2020).

37.    If an agency concludes, based on the EA, that an EIS is not required, it must prepare a FONSI, which explains the agency's reasons for its decision. *Id.* §§ 1501.6(a)–(c), 1508.1(l) (2020).

38.    The analysis of alternatives should present the environmental impacts of the proposed action and the alternatives based on the information and analysis presented. *Id.* § 1502.14 (2020). The analysis must evaluate reasonable alternatives to the proposed action, identify a "no action" alternative, discuss in detail each alternative considered, and discuss the reasons alternatives were eliminated from the detailed study. *Id.* § 1502.14(a)–(f) (2020). These alternative analysis requirements also apply to EAs. *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1501.5(c)(2) (2020).

## The Administrative Procedure Act

39.    The APA provides for judicial review of final agency action by persons "aggrieved" by such action. 5 U.S.C. § 702. The actions reviewable under the APA include any "preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final agency action." *Id.* § 704.

40.    The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations. *Id.* §§ 553, 551(4). Specifically, agencies must provide "[g]eneral notice" of any "proposed rule making" to the public through publication in the Federal Register. That notice must include: "(1) a statement of

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. § 553(b). An agency's responsibility to consider public comments on a proposed rulemaking is required by 5 U.S.C. § 553(c).

41. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D).

## STATEMENT OF FACTS

### The Cook Inlet Salmon Fishery

42. Upper Cook Inlet is home to five species of anadromous salmon—chinook, sockeye, coho, pink, and chum—as well as steelhead trout. These are some of the largest natural, wild returns of salmon in the nation. And unlike many of our nation's fisheries that are fully utilized (or even overutilized), Cook Inlet salmon stocks are largely underutilized. For example, in 2014, an estimated 20 million pink salmon returned to Cook Inlet, but state restrictions limited harvest to 642,754 fish, with *15 million pink salmon not utilized* and not needed for biological purposes. This happened again in 2020.

43. The Kenai River sockeye runs in Cook Inlet, in particular, are world-class, with the potential to produce millions of adult sockeye annually. These sockeye are also

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

genetically unique, with an unusual variety in the age and large size of adult returning stocks.

44.     The commercial fishery on these Cook Inlet anadromous stocks dates back to at least 1882, utilizing all manner of gear types, from fishwheels to driftnets.  The federal government expressly recognized the national importance of maintaining this commercial fishery in 1952 when it negotiated by treaty to exclude Cook Inlet from an international treaty banning most net fishing activities outside of state waters.

45.     Commercial fishing in Upper Cook Inlet is currently limited to two gear types (set and drift gillnets) and occurs on all five Cook Inlet anadromous salmon stocks. When they are permitted to fish, eastside set net operations deploy gillnets from fixed locations near shore, anchored to the bottom, and commonly extending in sections as far as one and a half miles offshore.  Westside set net operations are commonly extended up to five miles off shore.  Northern District set net operations commonly extend up to 10 miles off the northern inlet shores.  Drift gillnets, by contrast, are deployed from small vessels.

46.     The majority of commercial fishing harvest in Upper Cook Inlet is sockeye. The majority of the commercially caught Cook Inlet salmon find their way to grocery stores and restaurants in the United States.  Cook Inlet salmon are an important and healthy part of the nation's food supply.

47.     The Cook Inlet salmon fishery is highly competitive and requires conservation and management.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
14

**The 1990 Salmon FMP**

48.     The last major revision to the Salmon FMP was in 1990.  The 1990 Salmon FMP has two management areas: the East Area and the West Area.  The border between the two areas is the longitude of Cape Suckling.

49.     The 1990 Salmon FMP addressed commercial salmon fishing in the East and West Areas differently.  In the East Area (which consists primarily of coastal waters off southeast Alaska), the 1990 FMP set forth the Council's management goals and objectives.  The 1990 FMP delegated management of East Area fisheries, consistent with the Council's management goals and objectives, to the State of Alaska.

50.     In the West Area, by contrast, the 1990 Salmon FMP provided little guidance on how to manage salmon.  Instead, the 1990 Salmon FMP closed the vast majority of the West Area to commercial fishing, consistent with prohibitions in the International Convention for the High Seas Fishery of the North Pacific Ocean ("High Seas Convention").  Also consistent with the High Seas Convention, the 1990 FMP exempted from this closure three historic net fisheries: Cook Inlet, Prince William Sound, and the Alaska Peninsula area.  The EEZ portion of Cook Inlet open to fishing is a contiguous area of approximately 1,100 square miles.  The 1990 Salmon FMP did not expressly delegate management to the State of Alaska or set clear management goals or objectives for the West Area.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

51.     The High Seas Convention was repealed and replaced in 1992 by the North Pacific Anadromous Stock Act of 1992, which contained no provisions for management of the three historic net fisheries areas.  Despite the change in the law, the Council took no action for nearly 20 years to make changes to the FMP to clarify for the West Area how it was to be managed.

### The State of Alaska's Management of the Cook Inlet Salmon Fishery

52.     The State of Alaska has managed the salmon fisheries in Alaska since 1960.  As a condition of statehood, Alaska was allowed to manage the Cook Inlet salmon fishery provided that "the Alaska State Legislature has made adequate provision for the administration, management, and conservation of said resources in the broad *national interest*."  Alaska Statehood Act, Pub. L. No. 85-508 § 6(e), 72 Stat. 339, 341 (1958) (emphasis added).  The State of Alaska sets its fishery management policies through the Alaska State Board of Fish and implements those management policies through the Alaska Department of Fish and Game.

53.     The State of Alaska manages salmon in Cook Inlet based on a series of state management plans without federal oversight.  Generally speaking, these management plans set escapement goals for salmon.  An escapement goal, in this context, is the number of salmon that the state has determined is necessary or desirable to "escape" past fishing sectors and, thereby, provides spawning stock for successive generations or meets other needs.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

54.     The state management plans also include allocation decisions.  Allocation

decisions are generally made by setting the number of fishing days, including time and

area, allowed for a particular gear type during the season.

55.     In season, the state manages these fisheries based on assessments of run

strength, as measured against desired escapement goals.  In theory, if the run strength is

estimated to be larger than normal, then more fishing days are authorized to avoid

exceeding maximum escapement targets.  If run strengths are estimated to be smaller than

normal, then fewer fishing days are authorized to avoid dropping below minimum

escapement targets.  These run strength assessments are based on preseason forecasts, test

boat data, and other factors.

56.     Setting science-based escapement goals for salmon is essential to a well-

managed fishery.  If an escapement goal is set too low, then the fishery gets overfished

and run strengths diminish over time.  If an escapement goal is set too high, then the

harvestable surplus is lost.  Where too many salmon escape and spawn, the fitness of that

run may also be diminished in future years due to density-dependent effects and other

biological and ecological factors.  That is especially the case for sockeye, where rearing

space and food supply in the lakes and rivers are a limiting factor.  Over-escapement

events can reduce run strengths for two or three successive years.

57.     The state has two basic kinds of escapement goals: biological and

sustainable.  Biological escapement goals are intended to achieve the MSY (human

consumption for that fishery as a food resource).  Sustainable escapement goals, by

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

contrast, are based on historical data showing that a certain harvest level can be sustained. In Upper Cook Inlet, only one salmon stock has a biological escapement goal. This goal has not been peer reviewed or set for MSY as required by MSA and National Standard 1.

58.　　Beginning in 2000, the state imposed a "Sustainable Salmon Fisheries Policy" ("SSFP") intended to ensure the long-term viability of salmon runs in Alaska.

59.　　The state has affirmatively stated that it is under no obligation to comply with the MSA in making its fishery management decisions, and it has said it "would not accept a delegation of management authority for the Cook Inlet EEZ salmon fishery under the conditions that would be necessary to comply with the MSA," i.e., that it will not manage fishing in state waters consistent with the MSA. Indeed, the state's record has shown that it has not managed fishing, especially the fishing in Cook Inlet, in a manner consistent with the MSA.

60.　　In 1990, when the last Salmon FMP was created, the state typically managed the salmon fishing sectors in accordance with the MSA. Beginning in 1996, the state began departing from MSA management. And, when the state subsequently adopted the SSFP, it no longer made any attempt to manage fishing in Cook Inlet under MSA standards.

61.　　The Cook Inlet salmon fishery was historically one of the nation's most productive salmon fisheries. In the 1980s and 1990s, the sockeye salmon harvest alone ranged consistently from four to nine million sockeye per year. During the last two decades, the commercial harvest in Cook Inlet has steadily—and more recently,

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

18

123369004.1 0014655-00005

Case 3:24-cv-00116-JMK　Document 1　Filed 05/29/24　Page 18 of 35

precipitously—declined. The 10-year average annual commercial sockeye catch for 2014–2023—based on the preliminary data released by the State of Alaska, Department of Fish and Game for 2023—was just 1.65 million sockeye. A significant portion of this reduction in catch has been converted by the state's management to over-escapement (surplus to optimum yield "OY") into the Upper Cook Inlet river systems. For example, just in 2023, the total sockeye harvest (1.6 million sockeye) was approximately equal to or less than the over-escapement in just two rivers—the Kenai and Kasilof Rivers—which were overescaped by 1.65 million sockeye. If the commercial fleet had been permitted to catch this over-escapement, their total catch for the season would have been over 3 million sockeye, below the low end of the historical average but a significant improvement over the status quo. Instead, these fish were wasted due to the state's failure to manage in accordance with the upper bound of its escapement goals, which resulted in lost yield in 2023 and jeopardized yield in future years.

62. Accompanying the last two decades of historically low salmon harvest is the state's decision to gradually restrict the commercial fishery year after year, with most openings now being severely geographically limited to only a narrow band, preventing the fishery from targeting areas where salmon congregate. At the same time, the state has continued to increase "escapement" levels to record high (and likely unsustainable) levels in order to guarantee more than enough fish for the sport fishers to catch and to stock the

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
19
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 19 of 35

state resident-only personal use fishery with hundreds of thousands of fish.[1]  Even with inflated escapement targets, the restrictions on commercial fishing are so significant that the state still regularly exceeds those escapement goals by a wide margin.

63.     The state restrictions have resulted in severe financial hardship to the U.S. citizens participating in the Cook Inlet commercial salmon fishery, as well as the businesses that rely on the commercial harvest.  Twenty years ago, Cook Inlet had 23 major salmon processors willing to purchase and prepare salmon for the wholesale and retail markets, including both international markets and local food stores throughout the U.S.  Presently, there are only two major salmon processors left in Cook Inlet.

64.     Importantly, these state restrictions are based not on science or sound principles of species conservation and fishery management, but rather on other "allocative purposes," like "mak[ing] sport fisheries more enjoyable."  In fact, as a result of the state's over-escapement approach, the increasing *sport* fishery (and the resident-only personal use fishery) has harmed Cook Inlet salmon by causing "serious in-river habitat degradation problems such as hydrocarbon pollution and turbidity levels that exceed clean water standards, and miles of trampled riverbanks." Millions of salmon go unharvested every year while the commercial fleet is sidelined, to the detriment of Plaintiffs' members, local fishing communities, and the national interest in this important food source as expressed by the Magnuson-Stevens Act.

---

[1] For example, the in-river escapement goal for sockeye in the 1980s and early 1990s (when the fishery was doing very well) was 400,000 to 700,000.  By 2011, the state ratcheted that goal to 1.1 million to 1.35 million, with no underlying biological basis for the change.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

65.     As noted above, only one salmon stock in Cook Inlet is claimed to have a biologically based escapement goal.  Many runs in Cook Inlet have no escapement goal of any kind.  There are no escapement goals for pink salmon, only one tributary with escapement goals for chum, and two tributaries with escapement goals for coho.  Of the 35 chinook tributaries, only seven have any escapement goals or monitoring data, and most of those seven are listed under the state designation of "stock of concern."

66.     State management in Cook Inlet has destabilized the fishery.  As a result, many seafood processors have simply quit doing business in Cook Inlet, citing a hostile business environment created by state mismanagement as the reason.  Harvests of some stocks have declined as much as 50% due to state management.  Every year, millions of salmon (worth tens of millions of dollars to local and national communities and businesses), above and beyond those necessary to meet biological needs, go unharvested due to state mismanagement.

## History of This Litigation

67.     In 2010, Plaintiffs sought to turn the tide of state mismanagement of the fishery by appealing to NMFS and the Council, and asking for the development of an FMP to manage the Cook Inlet salmon fishery in a manner consistent with the National Standards of the MSA.  NMFS and the Council flatly refused, claiming that they (as the entities entrusted by Congress to manage the nation's fishery resources) lacked the expertise to manage salmon in Alaska (even though they, in fact, manage salmon in other areas of Alaska).  Instead, in 2012, NMFS and the Council issued Amendment 12 to the

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

Fishery Management Plan for Salmon Fisheries in the EEZ off the Coast of Alaska (the "Salmon FMP"). *See* 77 Fed. Reg. 75,570 (Dec. 21, 2012). Amendment 12 cut the Cook Inlet salmon fishery out of the Salmon FMP altogether and deferred all management authority to the State of Alaska.

68. Plaintiffs initiated this litigation more than a decade ago against Federal Defendants (collectively "NMFS") to challenge Amendment 12. The Ninth Circuit Court of Appeals agreed with Plaintiffs that NMFS' decision to defer management to the State of Alaska in Amendment 12 was illegal. *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv. (UCIDA I)*, 837 F.3d 1055, 1063 (9th Cir. 2016). The Ninth Circuit instructed that NMFS could not "wriggle out of" its duties or "shirk" the statutory command to produce an FMP for the Cook Inlet salmon fishery. *Id.* at 1063, 1064. Moreover, the Ninth Circuit rejected NMFS's argument that the Magnuson-Stevens Act "does not expressly require an FMP to cover an entire fishery." *Id.* at 1064. Furthermore, the "Act makes plain that federal fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns." *Id.* at 1063.

69. The Ninth Circuit's decision in September of 2016 initiated a five-year administrative process that NMFS, the Council, and the State of Alaska turned into a complete farce. At the last minute, the Council completely abandoned its efforts to create a federally delegated or a federally managed FMP program for the Cook Inlet salmon fishery. Instead, at the urging of the State of Alaska (and with help from NMFS), the

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
22
123369004.1 0014655-00005

Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 22 of 35

Council proposed an amendment ("Amendment 14") to close commercial salmon fishing in federal waters altogether, and relinquish and defer all management decision for the Cook Inlet salmon fishery to the State of Alaska. This was precisely the opposite of what the Ninth Circuit instructed. NMFS issued final regulations implementing Amendment 14 on November 3, 2021. *See* 86 Fed. Reg. 60,568 (Nov. 3, 2021). Amendment 14 determined that "'[t]he Cook Inlet salmon fishery includes the stocks of salmon harvested by *all* sectors within State and federal waters of Cook Inlet,'" Dkt. 67 at 20 (quoting record), and that OY "for the Cook Inlet salmon fishery is set to the 'level of catch from all salmon fisheries occurring within Cook Inlet (State and Federal water catch) . . . .'" *Id.* at 23 (quoting record). In other words, Amendment 14 set OY as whatever the state has allowed under state management.

70. UCIDA challenged Amendment 14, and on June 21, 2022, this Court granted UCIDA's motion for summary judgment, vacating the final rule. *See* Dkt. 67. This Court explained that Amendment 14 effectuated another unlawful deferral to the state as it made "federal management standards in form rather than substance," violating the instructions in *UCIDA I. See id.* at 22–23. The Court also explained that OY based on state harvest levels violated National Standard 1—the obligation to set the "optimum yield from each fishery" and to do so on "'the basis of maximum sustainable yield ["MSY"] from the fishery.'" *Id*. at 26–27 (quoting 16 U.S.C. § 1802(33)). As the Court explained, "[b]ootstrapping statutorily required management measures, such as MSY and OY, to the actual number of fish caught in the Cook Inlet, as determined by the State of

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
23
123369004.1 0014655-00005

Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 23 of 35

Alaska, summarily casts the decision of what constitutes 'the amount of fish which . . . will provide the greatest overall benefit to the Nation' to the Alaska Department of Fish and Game.'" Dkt. 67 at 29 (quoting 16 U.S.C. § 1851(a)(1)).

71.     As a result of these (and many other) violations, the Court issued a remedy order on November 28, 2022, directing that NMFS "shall issue regulations implementing a new FMP amendment that is consistent with the Court's [SMJ] Order and the previous orders in this litigation and complies with the [MSA], the APA, and all other applicable laws by no later than May 1, 2024." Dkt. 103 at 10. The Court also required NMFS to file periodic status reports every 45 days, set a status conference in April 2023, and retained jurisdiction over the case. *See* Dkt. 77 at 10–11.

72.     In its third status report filed on April 13, 2023, NMFS explained that the Council "was scheduled to take final action to recommend an FMP amendment at its April 2023 meeting." Dkt. 98-1 at 1. "The Council had two viable alternatives to choose from: federal management of the fishery in the EEZ with specific management measures delegated to the State of Alaska (State) through the FMP (Alternative 2), or direct federal management of the fishery in the EEZ (Alternative 3)." Dkt. 98-1 at 1. NMFS explained that "the State informed NMFS and the Council during the Council meeting that it would not accept a delegation of management authority for the Cook Inlet EEZ salmon fishery under the conditions that would be necessary to comply with the MSA." Dkt. 98-1 at 2. NMFS explained that this left the Council with one viable management alterative: adopting a federal management regime. Dkt. 98-1 at 2. "NMFS proffered a motion that

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

would have adopted Alternative 3, but no member of the Council would second that motion." *Id.* NMFS explained that "[w]ith no other viable choice, [it] informed the Council that [it] would immediately begin work on a Secretarial amendment that would likely resemble Alternative 3." *Id.* NMFS explained that "[b]ecause the analysis needed to support Secretarial action mirrors the analysis NMFS completed for the Council, it is largely complete." Dkt. 98-1 at 3. NMFS stated that it "has not identified any legally viable management alternatives that were not presented to the Council, and NMFS is still on track to implement a final rule by May 2024." Dkt. 98-1 at 3.

73. In its response to NMFS' third status report, UCIDA explained its concerns with NMFS' use of the Secretarial Amendment process to "forge ahead with its failed proposed Council amendment," and UCIDA proposed several potential off ramps. *See* Dkt. 100 at 3–5.

74. On May 2023, the Court issued an amended remedy order explaining that "the actions taken by the Federal Defendants in the eleven months following the Court's [SMJ Order] are nearly identical to those taken to implement the now-vacated Amendment 14." Dkt. 103 at 9. "Given the history of this litigation and the progress of remand thus far, . . . stronger judicial intervention is necessary to ensure that the same processes do not yield the same result." Dkt. 103 at 9. Accordingly, the Court ordered the parties to collaborate in order to avoid a perpetual cycle of litigation. *See* Dkt. 103 at 9.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
25
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 25 of 35

75.     The parties had two collaboration meetings in May 2023 (*see* Dkt. 102 at 2) and filed a joint status report regarding the meetings (*see* Dkt. 104).  UCIDA explained its belief that "the parties are still very far apart on what constitutes a legal and effective FMP for the Cook Inlet salmon fishery."  Dkt. 104 at 7.  This notwithstanding, NMFS continued the process of developing Alternative 3.  *See* Dkts. 106–08, 110–12, and 118.

76.     On December 20, 2023, the Court held a status conference.  *See* Dkt. 119.  UCIDA alerted the Court to its concern that the remand process was heading for a trainwreck in May 2024.  *See* Dkt. 121-1 at 2.  UCIDA explained that it expected to file a motion to enforce in May 2024 and that continued litigation and non-compliance with the Magnuson-Stevens Act by NMFS was an unacceptable outcome.  *See* Dkt. 121-1 at 2.

77.     On April 30, NMFS published the final rule implementing Amendment 16.  89 Fed. Reg. 34718, 34719.  The next day, NMFS filed a Notice of Completion of Remand.  *See* Dkt. 132 at 2.

78.     In short, with Amendment 16, NMFS has once again found a new and clever way to try and continue to defer to the state's historic management practices, even as commercial harvests continue to dwindle.

## FIRST CLAIM FOR RELIEF

### (Failure to Comply with Prior Court Orders)

79.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
26
123369004.1 0014655-00005

Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 26 of 35

80.     Plaintiffs have not yet received the relief they are entitled to under their original complaint, the holding of the Ninth Circuit in *UCIDA 1*, and the holding of this Court in its order vacating Amendment 14.

81.     MSA Section 304(a) and (b), 16 U.S.C. § 1854(a)-(b), requires Defendants to ensure FMPs and implementing regulations are consistent with the requirements of the MSA.

82.     Amendment 16 continues to defer management to the State of Alaska without delegation through an FMP, including but not limited to by setting OY based on historic EEZ catch.  This is directly contrary to the applicable court orders.

83.     By continuing to refuse to comply with the MSA as held by the Ninth Circuit and this Court, NMFS has both prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law.  For these reasons, Plaintiffs are entitled to the relief requested below.

## SECOND CLAIM FOR RELIEF

### (Violation of the MSA and the APA—Amendment 16)

84.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

85.     The MSA allows judicial review pursuant to the APA, 5 U.S.C. § 706(2)(A), (B), (C), or (D). 16 U.S.C. § 1855(f)(1)(B).  Those provisions of the APA authorize reviewing courts to set aside federal agency action that is arbitrary, capricious,

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
27
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 27 of 35

and an abuse of discretion, in excess of statutory limitations, or without observance of the procedures required by law.

86.     MSA Section 304(a) and (b), 16 U.S.C. § 1854(a)-(b), requires Defendants to ensure FMPs and implementing regulations are consistent with the requirements of the MSA.

87.     In addition to and including all the reasons set forth above, Amendment 16 violates the MSA, and should be set aside under the APA for multiple reasons.  A non-exhaustive list is included below:[2]

a.     Amendment 16 fails to comply with the MSA's statutory requirement to provide an FMP for each entire fishery under its jurisdiction that requires conservation and management.  "Fishery" is a defined term that dictates the scope of an FMP.  Amendment 16 improperly bifurcates the Cook Inlet salmon fishery into artificial state and federal components based on a purely jurisdictional justification and then fails to provide an FMP that covers fishing in state waters.

b.     Amendment 16 fails to set OY for the "fishery."  Amendment 16 establishes OY based on historical catch in the EEZ under the State of Alaska's management.  It effectively implements the state's mismanagement into federal law.  This is unlawful deferral.  Further, Amendment 16's OY measure is not based on MSY, as required by the MSA.

---

[2] Plaintiffs filed detailed comments on Amendment 16 detailing the legal flaws.  Those comments are attached to this Complaint and incorporated herein.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

c.     For stocks that do not have State of Alaska escapement goals, Amendment 16 uses historical catch to set MSY, again effectively implementing state mismanagement into federal law.  This is deferral, and it violates the MSA.

d.     Amendment 16 also runs afoul of National Standard 1 and Required Provision 3.  National Standard 1 requires that an FMP achieve OY, which is defined both in terms of the "greatest overall benefit to the Nation" as well as achieving MSY.  Required Provision 3 requires an FMP to assess and specify MSY and OY for the fishery.  Amendment 16 does not meet these requirements.  Amendment 16 does not set OY for the fishery, take any steps to ensure that OY is met for the fishery, or even contemplate keeping track of whether OY is met for the fishery.

e.      Amendment 16 is not based on the best scientific information available as required by National Standard 2.  NMFS openly concedes and even proclaims that its management approach is not the best approach, and it accordingly cannot be based on the best scientific information available.

f.     Amendment 16 violates National Standard 3.  NMFS agrees that management of salmon stocks as a unit or in close coordination throughout all Cook Inlet is particularly important, but then NMFS fails to effectuate the management of Cook Inlet salmon stocks as a unit.  Instead, NMFS arbitrarily cuts the fishery up for purposes of conservation and management measures required by an FMP.  Management of salmon stocks as a unit or in close coordination

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

throughout all of Cook Inlet is particularly important, and it is well within NMFS' power to achieve. Amendment 16 violates National Standard 3.

g.     Amendment 16 does not adequately consider or promote efficiency in the utilization of fishery resources, and it fails to minimize costs and avoid unnecessary duplication to the extent practicable in violation of National Standards 5 and 7. Rather than promote efficiency or minimize costs and avoid duplication, Amendment 16 appears to be specifically crafted to ensure the new "Cook Inlet EEZ fishery" is as inefficient and economically burdensome as possible. This includes the requirements that fishery participants obtain new federal permits; install expensive, unnecessary, and inappropriate VMS equipment; and provide intrusive GPS tracking in excess of statutory authority. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023). Further, NMFS chose to open fishing in the EEZ on the same days and at the same times that state fishing is open but to prohibit participants from fishing in state and federal waters during the same trip. This limitation is extremely inefficient, impracticable for participants, and appears punitive.

h.     In addition, Amendment 16's use of a TAC—when the fishery should be managed using escapement goals—is a separate violation of many of the national standards mentioned above. Both the State of Alaska and the stakeholders have repeatedly informed NMFS that TACs are not appropriate for salmon management.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
30
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 30 of 35

i.　　　Amendment 16 also violates National Standard 4 by allocating fishing privileges among Cook Inlet salmon fishermen but without doing so in a manner that is fair and equitable to all fishermen.  By severely limiting federal waters harvest opportunity, NMFS allocates the privilege to harvest to state-waters fishing sectors.  A prerequisite to an allocation of this type is a finding that it is fair and equitable.  NMFS has made no such finding.

j.　　　Amendment 16 violates National Standard 8 because it fails to account for the importance of fishery resources to the Cook Inlet fishing communities and does not utilize economic and social data to provide for the sustained participation of such communities and to minimize adverse economic impacts on such communities.

88.　　　Amendment 16 is arbitrary, capricious, and contrary to the MSA, and NMFS's approval of Amendment 16 has prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law.  For these reasons, Plaintiffs are entitled to the relief requested below.

## THIRD CLAIM FOR RELIEF

### (Violation of NEPA and the APA)

89.　　　Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

90.　　　NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

123369004.1 0014655-00005

environment." 42 U.S.C. § 4332(2)(C). NEPA requires an agency to take a hard look at the environmental consequences of a proposed action, including by disclosing and analyzing the significance of all direct, indirect, and cumulative environmental impacts of each alternative. 40 C.F.R. §§ 1502.14, 1502.16 (2020). The agency's analysis must include accurate scientific analysis, expert agency comments, and public scrutiny. *Id.* §§ 1502.23, 1501.5 (2020); 40 C.F.R. § 1500.1(b) (1978) (amended July 16, 2020).

91. If there exist substantial questions whether the action may have a significant effect on the environment, the agency must prepare an EIS.

92. If an agency decides not to prepare an EIS for a major federal action, it must supply a convincing statement of reasons to justify its conclusion that a project will not have significant impacts on the environment. *Id.* §§ 1508.1(l), 1501.6 (2020).

93. NMFS failed to produce a convincing statement of reasons demonstrating that Amendment 16 will not have significant impacts on the environment. NMFS has not taken a hard look at the environmental and conservation impacts that will occur to Cook Inlet salmon stocks as a result of managing via a TAC in the EEZ. Likewise, NMFS failed to take a hard look at the socioeconomic consequences of separately managing the EEZ portion of the fishery under a highly restrictive TAC. The state has a demonstrated pattern of commercial fishery disasters in Cook Inlet over the last decade, and Amendment 16 ensures a permanent disaster situation.

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
32
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 32 of 35

94.     NEPA requires an agency to develop and assess appropriate alternatives in any proposal involving unresolved conflicts concerning uses of available resources. 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1507.2(d), 1501.5(c)(2) (2020).

95.     The EA fails to consider a reasonable range of alternatives. Alternative 1 (no action) was foreclosed by the Ninth Circuit. Alternative 2 (delegation to the state) was foreclosed by the State of Alaska's refusal to accept delegation. Alternative 4 (closure of the EEZ) was foreclosed by this Court. Accordingly, the EIS only considered Alternative 3 (separate federal management), which NMFS repeatedly described as an ineffective method for managing fishing in the EEZ. These are not real alternatives. Rather than engage in the work needed to develop viable and effective alternatives, NMFS moved forward with an alternative that the Council refused to pursue. While there is no set number of alternatives that must be considered, it should be plain that an agency cannot structure its alternatives so there is only one available alternative. NMFS was required to, at the very least, consider a version of Alternative 3 that was feasible (as suggested by UCIDA and CIFF in public comments) and that would effectively manage the fishery.

96.     The EIS also fails to meaningfully consider reasonable management alternatives to using a TAC, like escapement-based management, even though stakeholders are essentially unanimous that a TAC is not an effective management measure for a salmon fishery. NMFS is not so constrained that it is excused from its

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
33
123369004.1 0014655-00005
Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 33 of 35

failure to consider viable and effective alternatives, rather than settling on an alternative that it admits is ineffective.

97.     NMFS's decision to approve Amendment 16 without considering appropriate alternatives and comparing the environmental impacts of those alternatives was arbitrary, capricious, and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1502.14(a), 1507.2(d), 1501.5(c)(2) (2020), and the APA, 5 U.S.C. §§ 702, 706.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that the Defendants violated the MSA, APA, and NEPA;

B.     Declare that the Defendants' actions, as set forth above, were arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

C.     Declare that Amendment 16 is not consistent with the Ninth Circuit's or this Court's decisions in this matter;

E.     Vacate Amendment 16 and its implementing regulations, and remand with an order instructing the Defendants to develop an FMP for the *entire* Cook Inlet salmon fishery that complies with the requirements of the MSA, APA, and NEPA, and the Ninth Circuit's and this Court's holdings;

F.     Vacate the FONSI, and remand with an order instructing, as appropriate, the Defendants to prepare an EA or EIS that complies with NEPA and the APA;

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*

G.      Appoint a special master to supervise the development of an FMP amendment for the entire Cook Inlet salmon fishery, to set deadlines for the development of that FMP, and to impose interim fishery management measures for the Cook Inlet salmon fishery until the FMP amendment is both issued and fully implemented;

H.      Award Plaintiffs their reasonable attorney fees, costs, expenses, and disbursements, including attorney fees associated with this litigation pursuant to the Equal Access to Justice Act or other law; and

I.      Award Plaintiffs other and further relief as this Court may deem just and equitable.

DATED this 29th day of May, 2024.

STOEL RIVES, LLP

*/s/ Jason T. Morgan*
Ryan P. Steen, AK Bar No. 0912084
Jason T. Morgan, AK Bar No. 1602010
Connor R. Smith, AK Bar No. 1905046

*Attorneys for Plaintiffs United Cook Inlet Drift Association and Cook Inlet Fishermen's Fund*

**COMPLAINT AND PETITION FOR REVIEW**
*United Cook Inlet Drift Association, et al. v. NMFS, et al.*
35
123369004.1 0014655-00005

Case 3:24-cv-00116-JMK   Document 1   Filed 05/29/24   Page 35 of 35