# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

UNITED COOK INLET DRIFT
ASSOCIATION, *et al.*,

        Plaintiffs,

    v.

NATIONAL MARINE FISHERIES
SERVICE*, et al.*,

        Defendants,

    and

STATE OF ALASKA*,*

        Intervenor-Defendant.

Case No. 3:24-cv-00116-SLG

## <u>DECISION AND ORDER</u>

Plaintiffs in this case are United Cook Inlet Drift Association ("UCIDA") and Cook Inlet Fishermen's Fund.[1] Plaintiff UCIDA is a corporation with approximately 200 members who "hold limited-access salmon driftnet fishing permits, issued by the State of Alaska, in Cook Inlet," and approximately 30 members who are "fish processors, gear suppliers, crew members, and other interested members of the community."[2] Plaintiff Cook Inlet Fishermen's Fund is a non-profit organization with "446 members, including commercial fishermen of all gear types, seafood

---

[1] Docket 1 at ¶¶ 4, 9.

[2] Docket 1 at ¶¶ 4, 7.

processors, and community members."[3]   Plaintiffs bring this suit to challenge Federal Defendants' adoption of Amendment 16 to the Fishery Management Plan for Salmon Fisheries in the Exclusive Economic Zone ("EEZ") off the Coast of Alaska ("Cook Inlet Salmon FMP").[4]   The Cook Inlet Salmon FMP was developed pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA").[5]   Plaintiffs contend that Amendment 16 violates the MSA and the Administrative Procedure Act ("APA"), and seek an order vacating Amendment 16.  For the reasons set forth below, Plaintiffs' request for relief is DENIED and their claims are DISMISSED.

## BACKGROUND

## I.   Magnuson-Stevens Act

The Cook Inlet Salmon FMP was created pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1801–1891d, which provides for exclusive federal management over fisheries within the United States' EEZ.[6]   Pursuant to the MSA,

---

[3] Docket 1 at ¶ 9.

[4] Federal Defendants are the National Marine Fisheries Service ("NMFS"); National Oceanic and Atmospheric Administration ("NOAA"); Howard W. Lutnick, in his official capacity as Secretary of the U.S. Department of Commerce; Janet Coit, in her official capacity as Assistant Administrator of NOAA; and Jon Kurland, in his official capacity as NMFS Alaska Region Administrator.  Docket 1 at ¶¶ 13-16.  Howard W. Lutnick was substituted for Gina Raimondo, in her official capacity as Secretary of the U.S. Department of Commerce, pursuant to Federal Rule of Civil Procedure 25(d).

[5] *See* 16 U.S.C. §§ 1801–1891d.

[6] 16 U.S.C. §§ 1811(a), 1802(11).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 2 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 2 of 32

"[s]tates retain[] jurisdiction over the first three miles from the coast, and the federal government [has] jurisdiction over the next 197 miles," the EEZ.[7]  Generally, "nothing in [the MSA] shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries."[8]

In order to conserve and manage federal fisheries, the MSA established eight Regional Fishery Management Councils, which prepare FMPs and plan amendments, and propose implementing regulations.[9]  The North Pacific Fishery Management Council ("Council") is the regional council that has "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."[10]  Although the Secretary of Commerce is responsible for reviewing and implementing FMPs, the Secretary has delegated that authority to the National Marine Fisheries Service ("NMFS").[11]

The MSA directs each Regional Fishery Management Council to prepare and submit an FMP for each fishery under its authority that requires conservation

---

[7] *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1058 (9th Cir. 2016) [hereinafter *UCIDA I*] (citations omitted).

[8] 16 U.S.C. § 1856(a)(1); *see id.* § 1856(b) (providing exception where Secretary may regulate a fishery within the boundaries of a state pursuant to an FMP in certain circumstances and after notice and opportunity for a hearing).

[9] 16 U.S.C. §§ 1852(a), (h), 1853(c).

[10] 16 U.S.C. 1852(a)(1)(G).

[11] 16 U.S.C. § 1802(39); *id.* § 1854 (outlining the Secretary's responsibilities and authority); *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 889 (9th Cir. 2010) (discussing the Secretary's delegation of authority to NMFS).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 3 of 32
Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 3 of 32

and management.[12]  The MSA defines "fishery" as "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and (B) any fishing for such stocks."[13]  In turn, "stock of fish" is defined as "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit."[14]

FMPs must comply with both the National Standards and the Required Provisions that are contained in the MSA.[15]  As relevant to this case, National Standards 1-3 and 10 are as follows:

> (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.
>
> (2) Conservation and management measures shall be based upon the best scientific information available.
>
> (3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.
> . . .
> (10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.[16]

---

[12] 16 U.S.C. § 1852(h)(1).

[13] 16 U.S.C. § 1802(13).

[14] 16 U.S.C. § 1802(42).

[15] *See* 16 U.S.C. §§ 1851, 1853.

[16] 16 U.S.C. § 1851(a)(1)-(3), (10).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 4 of 32

Further, Required Provision 3 provides that an FMP must "assess and specify the present and probable future condition of, and the maximum sustainable yield [("MSY")] and optimum yield [("OY")] from, the fishery, and include a summary of the information utilized in making such specification."[17] "Optimum" yield is

> the amount of fish which—(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.[18]

Federal regulations further explain that "[e]ach FMP must include an estimate of MSY for the stocks and stock complexes that require conservation and management," and "[f]or stocks that require conservation and management, OY may be established at the stock, stock complex, or fishery level."[19]

## II. Cook Inlet Salmon FMP

In 1979, pursuant to the MSA, NMFS promulgated an FMP for the High Seas Salmon.[20] The High Seas Salmon FMP divided federal waters in Alaska into two areas: East and West. Cook Inlet is in the West Area. The FMP prohibited

---

[17] 16 U.S.C. § 1853(a)(3).

[18] 16 U.S.C. § 1802(33).

[19] 50 C.F.R. § 600.310(e)(1), (3).

[20] Fishery Management Plan for the High Seas Salmon; Fishery Off the Coast of Alaska, 44 Fed. Reg. 33250 (June 8, 1979).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 5 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 5 of 32

commercial salmon fishing in the West Area, excepting Cook Inlet and two other areas where commercial net fishing had historically been permitted under Alaska law.[21] The FMP also provided that the State of Alaska would continue to manage fishing in Cook Inlet.[22]

In December 2012, NMFS promulgated an amendment to the FMP—Amendment 12—which removed Cook Inlet from the FMP's definition of the West Area; NMFS explained that "removing the net fishing areas and the sport fishery from the West Area allows the State to manage Alaska salmon stocks and directed fishing for those stocks as seamlessly as practicable throughout their range."[23] Plaintiffs challenged Amendment 12.[24] The Ninth Circuit held that Amendment 12 was contrary to law to the extent that it removed Cook Inlet from the FMP because NMFS could not delegate fisheries management in the EEZ to the State of Alaska by removing an area from an FMP.[25] Rather, "to delegate authority over a federal fishery to a state, NMFS must do so expressly in an FMP. If NMFS concludes that

---

[21] Fishery Management Plan for the High Seas Salmon; Fishery off the Coast of Alaska, 44 Fed. Reg. at 33267.

[22] Fishery Management Plan for the High Seas Salmon; Fishery off the Coast of Alaska, 44 Fed. Reg. at 33267.

[23] *See* Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon, 77 Fed. Reg. 75570, 75570-78 (Dec. 21, 2012); 50 C.F.R. § 679.2 (definition of West Area).

[24] Docket 1, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*, Case No. 3:13-cv-00104-TMB (D. Alaska June 14, 2013).

[25] *UCIDA I*, 837 F.3d at 1063, 1065.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 6 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 6 of 32

state regulations embody sound principles of conservation and management and are consistent with federal law, it can incorporate them into the FMP."[26] For example, "Amendment 12 expressly delegates management of the East Area—certain federal waters off Alaska not including Cook Inlet—to Alaska."[27] The Ninth Circuit rejected the Federal Defendants' argument that an FMP need not cover an entire fishery; the Circuit explained, "[w]hen Congress directed each Council to create an FMP 'for each fishery under its authority that requires conservation and management,' it did not suggest that a Council could wriggle out of this requirement by creating FMPs only for selected parts of those fisheries, excluding other areas that required conservation and management."[28] The Circuit further noted that "[t]he [Magnuson-Stevens] Act makes plain that federal fisheries are to be governed by federal rules in the national interest, not managed by a state based on parochial concerns."[29]

Following the Ninth Circuit's decision, this Court remanded Amendment 12 to NMFS without vacatur so that NMFS could prepare a new salmon FMP

---

[26] *Id.* at 1063 (citing 16 U.S.C. §§ 1856(a)(3)(B), 1853(b)(5)).

[27] *Id.* (first citing Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon, 77 Fed. Reg. at 75570-71; then quoting 50 C.F.R. § 679.1(i)(2) ("State of Alaska laws and regulations that are consistent with the Salmon FMP and with the regulations in this part apply to vessels of the United States that are commercial and sport fishing for salmon in the East Area of the Salmon Management Area."); and then citing *id.* § 679.3(f)).

[28] *Id.* at 1064 (first quoting 16 U.S.C. § 1852(h)(1); and then citing *id.* § 1853(a)).

[29] *Id.* at 1063.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 7 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 7 of 32

amendment for Cook Inlet.[30]  In an attempt to comply with the Ninth Circuit's order on remand, NMFS promulgated Amendment 14.[31]  Plaintiffs challenged Amendment 14.[32]  Once again, Plaintiffs succeeded.[33]  In June 2022, this Court vacated Amendment 14 after finding that several aspects of the amendment were arbitrary and capricious, including the failure to explain the exclusion of the recreational salmon fishery in the FMP when sport fishing had been included in Amendment 12, the improper delegation of management of the Cook Inlet fishery to the State of Alaska, and the closure of the commercial salmon fishery in the Cook Inlet EEZ area without independently determining that closure was warranted.[34]

In a third attempt to adopt a legally sufficient FMP for the Cook Inlet EEZ, in April 2023, the Council considered a draft Environmental Assessment ("EA") for Proposed Amendment 16 and four alternatives: (1) no action; (2) federal management of the fishery in the EEZ with specific management measures delegated to the State of Alaska; (3) federal management of the fishery in the EEZ;

---

[30] Docket 102, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*, Case No. 3:13-cv-00104-TMB (D. Alaska Aug. 3, 2017).

[31] Fisheries of the Exclusive Economic Zone Off Alaska; Cook Inlet Salmon; Amendment 14, 86 Fed. Reg. 60568 (Nov. 3, 2021).

[32] Docket 1, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*, Case No. 3:21-cv-00255-SLG (D. Alaska Nov. 17, 2021) [hereinafter *UCIDA II*].

[33] Docket 67 at 53-54, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska June 21, 2022).

[34] Docket 67 at 17-26, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska June 21, 2022).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 8 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 8 of 32

and (4) federal management of the commercial fishery in the EEZ with the EEZ closed to commercial fishing.[35] The Advisory Panel recommended that the Council adopt Alternative 2, federal management of the EEZ with specific management delegated to the State.[36] However, "[f]ollowing the Advisory Panel motion, . . . the State informed NMFS and the Council . . . that it would not accept a delegation of management authority for the Cook Inlet EEZ salmon fishery under the conditions that would be necessary to comply with the MSA."[37] "NMFS proffered a motion that would have adopted Alternative 3, but no member of the Council would second that motion."[38] The Council otherwise failed to recommend management measures for the Cook Inlet EEZ salmon fishery.[39] Therefore, NMFS prepared a Secretarial Amendment based on Alternative 3.[40]

---

[35] COUN00009; COUN00014-15.

[36] COUN00710.

[37] Docket 98-1 at 2, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska April 13, 2023).

[38] Docket 98-1 at 2, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska April 13, 2023); COUN00719-22.

[39] FR00001; Proposed Rule, Fisheries of the Exclusive Economic Zone Off Alaska; Cook Inlet Salmon; Amendment 16, 88 Fed. Reg. 72314, 72314 (Oct. 19, 2023) [hereinafter *Amendment 16 Proposed Rule*].

[40] COUN00723; 16 U.S.C. § 1854(c)(1)(A) ("The Secretary may prepare a fishery management plan, with respect to any fishery, or any amendment to any such plan, in accordance with the national standards, the other provisions of this Act, and any other applicable law, if—(A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management . . . .").

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 9 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 9 of 32

After providing public notice and an opportunity to comment on the proposed amendment, NMFS promulgated a final rule implementing Amendment 16 on April 30, 2024.[41]  Amendment 16 "incorporates the Cook Inlet EEZ into the Salmon FMP as the Cook Inlet EEZ Area, . . . a separate and distinctly managed area" and "establish[es] Federal fishery management for all salmon fishing that occurs in the Cook Inlet EEZ, which includes commercial drift gillnet and recreational salmon fishery sectors."[42]  Amendment 16 does not change the preexisting "Salmon FMP content related to the East Area and West Area."[43]

Regarding MSY in Amendment 16, NMFS explained that "MSY is a reference point, informed by the best available scientific information, related to maximum possible sustainable removals of a stock or stock complex throughout its range."[44]  In Amendment 16, MSY is

> defined as the maximum potential yield, which is calculated by subtracting the lower bound of the escapement goal (or another value as recommended by the Council's Scientific and Statistical Committee (SSC) based on the best scientific information available) from the total run size for stocks where data are available. Any fish in excess of that

---

[41] FR00029; Final Rule, Fisheries of the Exclusive Economic Zone off Alaska; Cook Inlet Salmon; Amendment 16, 89 Fed. Reg. 34718 (Apr. 30, 2024) [hereinafter *Amendment 16 Final Rule*].

[42] FR00029; Amendment 16 Final Rule, 89 Fed. Reg. at 34718.

[43] FR00029; Amendment 16 Final Rule, 89 Fed. Reg. at 34718; *see* FR00036 ("In this action, NMFS is complying with the Ninth Circuit's decision by incorporating the very ''fishery'' at issue in that case—the Cook Inlet EEZ salmon fishery—into the Salmon FMP.").

[44] FR00006; Amendment 16 Proposed Rule, 88 Fed. Reg. at 72319.  The Court references the proposed rule because the final rule incorporated the proposed rule by reference.  FR00030; Amendment 16 Final Rule, 89 Fed. Reg. at 34719 ("The definitions of MSY and OY are explained in greater detail in the preamble to the proposed rule and remain unchanged in this final rule.").

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 10 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 10 of 32

necessary to achieve the escapement goal for each stock or stock complex are theoretically available for harvest under this definition of MSY. For stocks where escapement is not known, historical catch would be used as a proxy for MSY. This definition of MSY is based on escapement goals established for salmon stocks in Cook Inlet, as informed by salmon stock assessments that use the best scientific information available, and undergo peer review by the Council's SSC.[45]

NMFS determined that "the best scientific information available to determine escapement goals for stocks in Cook Inlet are contained in the escapement goal analysis reports developed by the State of Alaska, which have been vetted by the SSC."[46]

NMFS also explained that "MSY must be defined at the stock or stock complex level without reference to management jurisdictions. In contrast, OY is a long term average amount of desired yield from a particular stock or fishery and is generally set below MSY."[47] "Under Amendment 16, OY would be defined at the EEZ fishery level to both account for the interactions between salmon stocks in the ecosystem and provide Federal managers with a target that is within their control to achieve."[48] Amendment 16 defines "the OY range for the Cook Inlet EEZ salmon fisheries in the Salmon FMP as the range between the averages of the three lowest

---

[45] FR00006; Amendment 16 Proposed Rule, 88 Fed. Reg. at 72319.

[46] FR00006; Amendment 16 Proposed Rule, 88 Fed. Reg. at 72319.

[47] FR00006; Amendment 16 Proposed Rule, 88 Fed. Reg. at 72319.

[48] FR00006; Amendment 16 Proposed Rule, 88 Fed. Reg. at 72319.

years of total estimated EEZ salmon harvest and the three highest years of total estimated EEZ salmon harvest from 1999 to 2021. . . . This results in a proposed OY range of approximately 291,631 to 1,551,464 salmon of all species."[49]

Further, Amendment 16 prohibits "[v]essels . . . from fishing in both State and Federal waters on the same day, or otherwise having on board or delivering fish harvested in both EEZ and State waters, to ensure accurate catch accounting for Federal managers."[50]

In May 2024, Plaintiffs filed this suit challenging several aspects of Amendment 16.[51] Plaintiffs also challenge the harvest specifications promulgated by NMFS pursuant to Amendment 16.[52] Plaintiffs' Opening Brief is at Docket 37. Federal Defendants and Intervenor-Defendant State of Alaska responded in opposition at Docket 40 and Docket 41, respectively. Plaintiffs replied at Docket 46. Federal Defendants filed a sur-reply at Docket 51-1.[53] Oral argument was held on March 25, 2025.[54]

---

[49] FR00007; Amendment 16 Proposed Rule, 88 Fed. Reg. at 72320.

[50] FR00033; Amendment 16 Final Rule, 89 Fed. Reg. at 34722.

[51] Docket 1.

[52] Docket 37 at 15; Fisheries of the Exclusive Economic Zone off Alaska; Cook Inlet; Final 2024 Harvest Specifications for Salmon, 89 Fed. Reg. 51448 (June 18, 2024).

[53] Defendants had filed a Motion to Strike or in the Alternative for Leave to File a Surreply. Docket 51. At oral argument, the Court granted Defendants' motion in the alternative and heard argument as to Plaintiffs' reply and Defendants' sur-reply. Docket 55.

[54] Docket 55.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 12 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 12 of 32

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[55]

## LEGAL STANDARD

Pursuant to the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[56]

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.[57]

The APA requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . . [C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."[58]

---

[55] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[56] 5 U.S.C. § 706(2)(A).

[57] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[58] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 13 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 13 of 32

"Courts give special deference to agency interpretations of scientific issues."[59] Where "evidence is susceptible of more than one rational interpretation," courts will uphold the agency's findings.[60] "The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise . . . . When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'"[61]

"A regulation implementing a FMP will be upheld under [16 U.S.C.] § 1851(a) unless the Secretary has acted in an 'arbitrary and capricious manner promulgating such regulations.' Stated another way, [a court] will uphold a regulation against a claim of inconsistency with a 'national standard' under § 1851 if the Secretary had a 'rational basis' for it."[62]

---

[59] *Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1512 (2025) ("Black-letter administrative law instructs that when an agency makes . . . predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983))).

[60] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (internal quotation marks and citation omitted).

[61] *Id.* at 602 (quoting *Baltimore Gas*, 462 U.S. at 103) (alteration in original).

[62] *Or. Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1119 (9th Cir. 2006) (quoting *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996)).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 14 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 14 of 32

## DISCUSSION

## I.   The Definition of Fishery[63]

Plaintiffs maintain that NMFS's FMP violates the MSA because the FMP defines fishery to include only those salmon in the federal waters of Cook Inlet. Plaintiffs assert that the FMP must set standards that apply to stocks and fishing not only within the Cook Inlet EEZ, but also in the adjacent state waters through which the salmon stock traverses. Plaintiffs maintain that "the plain language of the MSA" defines "fishery" to include "any fishing for such stocks";[64] in Cook Inlet, the stocks at issue are five species of salmon that are born inland in rivers and streams, migrate to the Pacific Ocean for several years, and then travel through the Cook Inlet EEZ and three miles through state waters when returning to their natal rivers and streams to spawn. Plaintiffs maintain the MSA requires that the Salmon FMP must include measures that would apply to salmon "once they leave the EEZ" and enter water under the jurisdiction of the State of Alaska because the

---

[63] As a threshold issue, Federal Defendants challenge Plaintiffs' standing "[t]o the extent Plaintiffs concede that NMFS lacks management authority in State waters." Docket 40 at 46-47. Federal Defendants maintain that "this lawsuit is against NMFS and would not change or effect State management" and therefore, the purported harms caused by State management of the Cook Inlet salmon fishery would not be redressed by any ruling by this Court. Docket 40 at 46-47. However, because the MSA contains a provision that provides for federal management of fisheries within state jurisdiction in certain circumstances, 16 U.S.C. § 1856(b), a court order directing NMFS to promulgate an FMP to cover state waters could lead to a redress of Plaintiffs' purported injuries. As such, the Court finds that Plaintiffs have standing.

[64] Docket 37 at 17 (quoting 16 U.S.C. § 1802(13)(B)).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 15 of 32

Case 3:24-cv-00116-SLG   Document 58   Filed 07/01/25   Page 15 of 32

state waters are part of the fishery.[65]  As such, in Plaintiffs' view, Amendment 16 violates the MSA because it is "artificially limited . . . to management measures governing the 'harvest[] by the commercial and recreation fishing sectors *within the Cook Inlet EEZ Area*.'"[66]

Plaintiffs contend that their position is supported by other MSA provisions, maintaining that "[t]here is no plausible reading of the statute that allows NMFS to apply the 'maximum sustainable yield' to the entire 'stock' but restrict 'optimum yield' to only that portion of the stock that is harvested in the EEZ.  Rather, both MSY and OY must be set for the 'fishery,' which, by definition, includes 'any fishing' for the stock."[67]  As such, in Plaintiffs' view, the MSA requires NMFS to establish an FMP and to set OY and MSY for the entire Cook Inlet salmon fishery, including fishing for salmon in waters within the State's jurisdiction, and a separate question remains as to whether the State is willing to comply with the FMP's standards or whether federal preemption is needed.[68]

Federal Defendants and the State of Alaska respond that the plain language of the MSA limits NMFS's jurisdiction to the EEZ and reserves to the State

---

[65] Docket 37 at 17, 20-22 (emphasis in original).

[66] Docket 37 at 21 (alteration and emphasis in original) (quoting FR00036).

[67] Docket 37 at 22.

[68] Docket 46 at 7-8.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 16 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 16 of 32

jurisdiction to manage fisheries within three nautical miles of Alaska's coastline.[69] Further, Federal Defendants contend that "the definitions of 'fishery' and 'stock of fish' do not turn on whether the fish are a biological unit" but rather "both definitions make clear that these are *management units*, not simply a biological designation, and must be defined based on the ability to treat them as a unit for management purposes."[70] Regarding MSY, Federal Defendants maintain that unlike the terms fishery or OY, MSY is "a biological reference point" and "nothing in the statute . . . suggests the definition of maximum sustainable yield mandates any particular definition of 'fishery' or is otherwise intended to drive the definition of the management unit."[71]

The Court finds that the MSA does not require NMFS to adopt an FMP that includes waters outside the EEZ. In *Oregon Trollers Ass'n v. Gutierrez*, the plaintiffs argued that a NMFS amendment to the Pacific Coast Salmon FMP violated the MSA's definitions of fishery and stock of fish because it "distinguish[ed] between natural and hatchery spawners for the purposes of Klamath chinook management and conservation" in setting a "35,000 natural spawner escapement floor."[72] Specifically, the plaintiffs maintained that "the categories of naturally

---

[69] Docket 40 at 28-30; Docket 41 at 16.

[70] Docket 40 at 34-35 (emphasis in original).

[71] Docket 40 at 35-36.

[72] *Or. Trollers*, 452 F.3d at 1108-09, 1117.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 17 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 17 of 32

spawning and hatchery spawning Klamath chinook are part of the same 'stock of fish' under the Magnuson Act.  In their view, the NMFS may not manage members of the same 'stock of fish' separately, or treat them differently for conservation purposes."[73]

The Ninth Circuit disagreed, interpreting the MSA's definition of "stock of fish"—"a species, subspecies, geographical grouping or *other category of fish capable of management as a unit*"—to hold that "[t]here is nothing in the [MSA] to suggest that natural spawners are not a 'division' or 'distinct class,' and hence a 'category,' of Klamath chinook."[74]  The Court observed that "[t]his host of possible bases for choosing a 'management unit' indicates the term's flexibility."[75]

The same is true in this case.  The salmon within the Cook Inlet EEZ are, at the very least, a "category of fish capable of management as a unit."  As such, Amendment 16 is consistent with the MSA's definition of fishery, i.e., "one or more stocks of fish which can be treated as a unit for purposes of conservation and management."[76] Subpart (B) of the MSA's definition of fishery does not expand the

---

[73] *Id.* at 1117.

[74] *Id.* at 1117-18 (emphasis in original) (quoting 16 U.S.C. § 1802(37)).

[75] *Id.* at 1118.

[76] 16 U.S.C. § 1802(13)(A).  The Court also notes that, pursuant to Amendment 16, the Salmon FMP rectifies the error identified by the *UCIDA I* Court, that "Amendment 12 is . . . contrary to law to the extent it removes Cook Inlet from the FMP," as now the Salmon FMP covers more than "a single ounce of water in that fishery," as it applies to the entire Cook Inlet EEZ.  *UCIDA I*, 837 F.3d at 1064-65.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 18 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 18 of 32

definition of "fishery" to encompass waters outside of the federal fishery. And yet under Plaintiffs' expansive definition, the FMP for the Cook Inlet EEZ would need to set standards for any location in which the salmon that travel within the EEZ might be fished – including inland rivers and foreign waters. In this same regard, as Federal Defendants observe, in *UCIDA I,* the Ninth Circuit held that NMFS was required to prepare an FMP for the "federal fishery."[77] The Circuit Court observed then that "[n]o one disputes that the exempted area of the Cook Inlet is a salmon fishery."[78] And the exempted area was only the EEZ portion of Cook Inlet, not the state waters. Nothing in that decision suggests that an FMP must extend to state waters.

Plaintiffs assert that *Oregon Trollers* supports their position because the provision of the Pacific Coast Salmon Plan at issue in that case defined the management zone for the Klamath chinook salmon to include the Klamath River from Oregon to California to the ocean.[79] The Ninth Circuit found that the provision complied with federal regulatory guidance that "the geographic scope of the fishery, for planning purposes, should cover the entire range of the stock(s) of fish, and not be overly constrained by political boundaries."[80] However, as Federal

---

[77] Docket 40 at 31 (quoting *UCIDA I,* 837 F.3d at 1063).

[78] *UCIDA I*, 837 F.3d at 1064.

[79] Docket 46 at 14; *Or. Trollers*, 452 F.3d at 1121.

[80] Docket 46 at 14 (internal quotation marks omitted) (quoting *Or. Trollers*, 452 F.3d at 1121

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 19 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 19 of 32

Defendants explain, in implementing the Pacific Coast Salmon Plan, NMFS "has a long and successful practice of managing federal and state waters fisheries collaboratively with Washington, Oregon, and California, with agreement from the States to take conforming measures. This type of cooperation has not been offered by the State of Alaska."[81]

Further, the text of National Standard 3 provides that "[t]o the extent practicable, an individual stock of fish shall be managed as a unit throughout its range,"[82] and National Standard 3's implementing regulations, which include 50 C.F.R. § 600.320(b), direct that the geographic scope of a fishery *should* cover the entire range of the stocks of fish. The Court does not read § 600.320(b) to mandate than an FMP must cover the entire range of a stock of fish; rather, the MSA and § 600.320(b) direct NMFS to manage stocks of fish throughout their range, but only "to the extent practicable."[83] As NMFS has explained, in this case it was not practicable to adopt an FMP with measures applicable to state waters because the

---

(quoting 50 C.F.R. § 600.320(b))).

[81] Docket 51-1 at 3.

[82] 16 U.S.C. § 1851(a)(3).

[83] *See UCIDA I*, 837 F.3d at 1065 ("The government's advisory guidelines fare no better, as they do not have the force of law." (citing 16 U.S.C. § 1851(b) ("The Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans."))).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 20 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 20 of 32

State of Alaska has declined to accept or implement delegated management measures.[84]

Finally, nothing in the text of the MSA requires NMFS to include management measures for waters within the State of Alaska's jurisdiction. The MSA preserves state jurisdiction over fisheries in the waters from the Alaska coastline to three nautical miles seaward. While the MSA contemplates cooperation between state and federal fisheries managers and permits the delegation of management pursuant to an FMP to state authorities, nothing in the MSA requires such an arrangement.

In sum, the Court finds that Amendment 16 does not violate the MSA's definition of fishery.

## II. Optimum Yield

Plaintiffs contend that Amendment 16's definition of optimum yield ("OY") violates the MSA and prior court orders. First, Plaintiffs reiterate their claim that NMFS cannot define an OY for the Cook Inlet EEZ fishery because NMFS has an "obligation to set OY for *any* harvest on the Cook Inlet salmon stocks, whether such harvest is in state or federal waters."[85] However, as discussed above, the

---

[84] *See* FR00054 ("The key term here is 'practicable.' It is not practicable for NMFS to manage salmon stocks into State waters where NMFS has no management jurisdiction, and, thus, NMFS has designed management measures that allow it to manage stocks of salmon as a unit throughout the portion of their range under NMFS's authority, grouping interrelated stocks of salmon together because vessels cannot target individual stocks in the EEZ.").

[85] Docket 37 at 26 (emphasis in original).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 21 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 21 of 32

MSA permits NMFS to define a fishery based on a category of fish capable of management as a unit, and the Court finds that the Cook Inlet EEZ salmon constitutes such a category.

Next, Plaintiffs contend that Amendment 16's OY is not based on MSY as required by the MSA because OY is based on salmon within the Cook Inlet EEZ whereas MSY is based on the entire stock of Cook Inlet salmon.[86] While Federal Defendants acknowledge that "NMFS defined maximum sustainable yield on a stock-by-stock basis, while optimum yield is set at the fishery level," they maintain that NMFS complied with the MSA because MSY must be defined at the stock level while OY can be set at either the stock or fishery level.[87]

The Court finds that Amendment 16's OY is based on MSY. As NMFS explained, "the maximum yield for each stock would be the total run of a stock minus the lower bound of its escapement goal range. However, because stocks cannot be targeted individually in the EEZ and are harvested in a mixed stock fishery, OY must be reduced to account for these ecological conditions and specified for the EEZ fishery as a whole."[88] While the MSA provides that OY "is

_____

[86] Docket 37 at 26 (citing 16 U.S.C. § 1802(33) ("The term 'optimum', with respect to the yield from a fishery, means the amount of fish which . . . is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor . . . .")).

[87] Docket 40 at 44 (citing 50 C.F.R. § 600.310(e)(1)(i)-(ii), (e)(3)).

[88] NMFS02235; *see* FR00007 (proposed Amendment 16 explaining that "because it is not possible to harvest one stock at a time in this mixed stock fishery, because there are weak stocks

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 22 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 22 of 32

prescribed on the basis of the maximum sustainable yield from the fishery," and here NMFS defined the fishery as Cook Inlet EEZ salmon, NMFS's decision to define MSY for stocks of salmon throughout their range and to limit OY to the Cook Inlet EEZ fishery was reasonable considering NMFS's jurisdiction is limited to the EEZ and the mixed stock nature of the Cook Inlet EEZ fishery.[89]  Further, as Federal Defendants note, pursuant to the MSA's implementing regulations, "maximum sustainable yield must be defined at the stock level, [whereas] optimum yield can be set at either the stock or fishery level."[90]

Plaintiffs also maintain that because Amendment 16 based the Cook Inlet EEZ OY on the average of the three highest and three lowest years of estimated EEZ salmon harvest, NMFS impermissibly deferred to the State of Alaska, in violation of this Court's order in *UCIDA II* regarding Amendment 14.[91]  Plaintiffs

---

intermingled with stocks that regularly exceed their escapement goal, and because harvest of all Cook Inlet stocks also occurs in State marine and fresh waters, OY must be reduced from MSY to account for these various ecological, economic, and social factors. For this reason, OY would be defined at the fishery level to account for mixed stock harvest and variabilities in run strength.").

[89] *See* Docket 40 at 36 (Federal Defendants explaining that "maximum sustainable yield is important to determining how many fish can be caught in fisheries under NMFS's jurisdiction in light of the biological condition of a stock throughout its range"); FR00039 (explaining that "[b]ecause MSY is not a management target, it does not depend on any management actions. Rather, it describes the capacity of a stock to be harvested sustainably, regardless of who manages fishing or how harvest is authorized.").

[90] Docket 40 at 44 (citing 50 C.F.R. § 600.310(e)(1)(i)-(ii), (e)(3)); FR00039 (explaining same).

[91] Docket 37 at 27 ("This directly violates this Court's prior order, which cautioned that '[t]he plan for continuous federal management cannot consist of the agency abandoning its responsibilities in favor of deferral to the State.'" (alteration in original) (quoting Docket 67 at 30, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska June 21, 2022))).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 23 of 32
Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 23 of 32

also contend that NMFS violated National Standard 1 because Amendment 16 purportedly defers to the State to maintain the status quo and "does not address the significant potential yield that is going un-harvested according to NMFS's own data."[92]

Amendment 14 prohibited commercial salmon fishing in the EEZ entirely; the *UCIDA II* Court found that "NMFS's decision to prohibit commercial fishing so that the State can effectuate its management strategy via state waters does not amount to express delegation of that management strategy through an FMP."[93] Further, the *UCIDA II* Court found that "[b]ootstrapping statutorily required management measures, such as MSY and OY, to the actual number of fish caught in the Cook Inlet, as determined by the State of Alaska, summarily casts the decision of what constitutes 'the amount of fish which . . . will provide the greatest overall benefit to the Nation' to Alaska's Department of Fish and Game."[94]

Here, Amendment 16 does not repeat the above errors identified in *UCIDA II*. Amendment 16 does not close the Cook Inlet EEZ to commercial fishing; rather, it provides a comprehensive FMP for the management of commercial fishing in the

---

[92] Docket 37 at 28 (first citing SPEC00180 ("demonstrating that in every year except one from 1999–2023, Kenai River Late Run Sockeye Salmon exceeded their escapement goal and produced a significant 'Potential Yield EEZ,' which are wasted fish"); and then citing SPEC00182 ("same for Kasilof River Sockeye Salmon")).

[93] Docket 67 at 30, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska June 21, 2022).

[94] Docket 67 at 29, *UCIDA II*, Case No. 3:21-cv-00255-SLG (D. Alaska June 21, 2022) (alteration in original) (quoting 16 U.S.C. § 1802(33)).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 24 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 24 of 32

Cook Inlet EEZ. Additionally, NMFS's use of the State's average harvest data to inform the OY for the Cook Inlet EEZ salmon fishery does not amount to deferral to the State. NMFS developed its own methodology to determine harvest levels in the Cook Inlet EEZ.[95] Further, as explained in Amendment 16, NMFS "evaluated historical EEZ harvest levels and found that harvest in the EEZ could not be increased to fully harvest surplus Kenai and Kasilof salmon without causing serious impacts to other salmon harvesters and major conservation problems for other stocks."[96] The Council's Scientific and Statistical Committee reviewed an independent analysis of whether there had been reduced yield as a result of overescapement in Kenai and Kasilof river sockeye salmon stocks and "found that [Alaska's] escapement goals were established within the range expected to produce MSY for those stocks, that [Alaska's] point estimates of MSY were accurate, and that there is limited evidence for [reduced yield due to overescapement] across the observed range of escapements for Kenai and Kasilof sockeye salmon."[97] NMFS also noted that Amendment 16 establishes a fishery

---

[95] FR00053 ("Previously, data regarding harvests, landings, and statistical areas in Upper Cook Inlet did not differentiate between State and Federal waters. Therefore, NMFS had to develop a methodology to estimate historic salmon harvest in the Cook Inlet EEZ.").

[96] FR00040

[97] FR00043

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 25 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 25 of 32

management framework that will provide NMFS with information needed to precisely determine EEZ harvest and establish harvest specifications.[98]

Given that NMFS developed its own methodology to calculate historic salmon harvests in the EEZ, considered whether harvests could be increased above Alaska's historical fishery management practices, and implemented mechanisms to collect data to reevaluate conservation and management measures annually, the Court finds that NMFS did not improperly defer to the State in defining OY in the EEZ. The Court also finds that NMFS did not violate National Standard 1 because it demonstrated a rational basis for establishing OY.[99]

### III. National Standards 2, 3, and 10

Plaintiffs maintain that NMFS violated the MSA's requirement, set forth in National Standard 2, that conservation and management measures be based upon the "best scientific information available."[100] In this regard, Plaintiffs contend that "[m]ultiple stock definitions that NMFS used in the final analysis for Amendment 16 were contrary to the recommendations of its own SAFE Team."[101] Specifically, "the SAFE Team recommended definitions that tracked these stocks throughout their range," and "[t]he analysis does not explain why NMFS disregarded the

---

[98] FR00053-54.

[99] *See Or. Trollers*, 452 F.3d at 1119.

[100] Docket 37 at 30 (quoting 16 U.S.C. § 1851(a)(2)).

[101] Docket 37 at 30.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 26 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 26 of 32

recommendations of its own SAFE Team."[102]  Federal Defendants respond that the SAFE Team definitions on which Plaintiffs rely "'include Cook Inlet EEZ Area harvests' and do not include State water harvest" and that Plaintiffs otherwise fail to explain "how these definitions are inconsistent."[103]

The Court notes that the portion of the record on which Plaintiffs rely is found in the Cook Inlet EEZ Area Salmon SAFE Report from May 2024, dated after NMFS issued the Final Rule for Amendment 16.  Plaintiffs do not cite other evidence demonstrating that NMFS considered a draft version of the SAFE Team report containing the same proposed definition.  Even assuming NMFS had considered the recommended definition from the SAFE Team, Plaintiffs do not explain the practical import of the differing definitions nor how NMFS's definition and the resulting conservation and management measures in Amendment 16 are not ultimately based on the best available science.[104]  As such, the Court finds that

---

[102] Docket 37 at 30 (first citing NMFS02223 (defining salmon stock and stock complexes that will receive tier assignments, status determination criteria, and harvest specifications within the Cook Inlet EEZ and limiting such stock definitions to those salmon harvested in Cook Inlet EEZ area); then citing SPEC00145 & SPEC00150 ("The NMFS SAFE Team recommends to the SSC that the Federal stock definition for Kasilof River sockeye salmon (KASOCK) would include Cook Inlet EEZ Area harvests, spawning escapements, and associated spawning escapement goals corresponding to the State definition for this stock."); and then citing NMFS02489).

[103] Docket 40 at 48 (first citing SPEC00145; and then citing SPEC00150).

[104] *See* COUN01826 (February 2024 Scientific and Statistical Committee Final Report to the North Pacific Fishery Management Council recommending harvest specifications that are identical to the harvest specifications recommended in the final SAFE Report at SPEC00118).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 27 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 27 of 32

NMFS did not violate National Standard 2 by adopting a definition different than the one recommended by the SAFE Team.[105]

Next, Plaintiffs contend that NMFS violated National Standard 3 because NMFS limited the conservation and management measures in Amendment 16 to the Cook Inlet EEZ and "fail[ed] to identify the state action and explaining the consequences of state inaction or contrary action."[106]   National Standard 3 provides that, "[t]o the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination."[107]  NMFS explained how Amendment 16 complied with National Standard 3, concluding that

> NMFS has no authority to manage salmon fishing that occurs in State waters, and thus there would necessarily be two separate Cook Inlet salmon fisheries. The State would not accept delegated management authority for the fishery. Under this action, NMFS would work with the State to the extent practicable in order [to] coordinate adjacent salmon fisheries and share scientific and fishery data collected between agencies to ensure that management actions are appropriately responsive to conditions throughout the range of stocks.[108]

---

[105] *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004) ("Where scientific and technical expertise is necessarily involved in agency decision-making, . . . a reviewing court must be highly deferential to the judgment of the agency.").

[106] Docket 37 at 31-32 (relying on 50 C.F.R. § 600.320(d)(2) ("FMPs should include conservation and management measures for that part of the management unit within U.S. waters, although the Secretary can ordinarily implement them only within the EEZ."); *id.* § 600.320(e)(3) ("Where state action is necessary to implement measures within state waters to achieve FMP objectives, the FMP should identify what state action is necessary, discuss the consequences of state inaction or contrary action, and make appropriate recommendations.").

[107] 16 U.S.C. § 1851(a)(3).

[108] NMFS02489; *see* FR00054 ("The key term here is 'practicable.' It is not practicable for NMFS

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 28 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 28 of 32

Because NMFS provided a rational basis for determining that a single management of Cook Inlet salmon throughout their range was not practicable, the Court finds that NMFS did not violate National Standard 3.[109]

Finally, Plaintiffs assert that NMFS violated National Standard 10 because Amendment 16 prohibits commercial fishing in state and federal waters on the same day.[110] According to Plaintiffs, this prohibition prevents fishermen from "mov[ing] to safer [state] waters closer to shore and keep fishing" if the weather in federal waters becomes "dangerous."[111]

National Standard 10 provides that "[c]onservation and management measures shall, to the extent practicable, promote the safety of human life at sea."[112] In adopting the prohibition on same-day fishing in state and federal waters, NMFS explained that if vessels were allowed to fish in both fisheries on the same day, those vessels' catch would contain a mix of salmon caught in the two management areas with no way to accurately apportion the catch between the

---

to manage salmon stocks into State waters where NMFS has no management jurisdiction, and, thus, NMFS has designed management measures that allow it to manage stocks of salmon as a unit throughout the portion of their range under NMFS's authority, grouping interrelated stocks of salmon together because vessels cannot target individual stocks in the EEZ.").

[109] *See Or. Trollers*, 452 F.3d at 1119.

[110] Docket 37 at 33-34.

[111] Docket 37 at 33.

[112] 16 U.S.C. § 1851(a)(10).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 29 of 32

Case 3:24-cv-00116-SLG     Document 58     Filed 07/01/25     Page 29 of 32

two areas.[113]  Without this prohibition, NMFS "could not accurately monitor EEZ harvests and ensure the fishery complies with all Magnuson-Stevens Act requirements."[114]

Federal Defendants maintain that Plaintiffs waived this argument because they did not raise a safety issue with the same-day prohibition during the notice and comment process.[115]  Further, they maintain that NMFS adequately explained how Amendment 16 complies with National Standard 10.[116]  Plaintiffs respond that the safety issue was raised in UCIDA's comment letters and that, in any event, "[t]here is no waiver when, as here, the asserted claims address the agency's obligation to comply with a statutory mandate" to "affirmatively promote the safety of human life at sea."[117]

The Court finds that even if Plaintiffs have not waived this particular argument, NMFS complied with National Standard 10.  In *Oregon Trollers*, the Ninth Circuit rejected the plaintiffs' claim that "by shortening the fishing season, the 2005 management measures unnecessarily obliged fishermen to go to sea

---

[113] FR00048.

[114] FR00048.

[115] Docket 40 at 51.

[116] Docket 40 at 52.

[117] Docket 46 at 29-30 (emphasis omitted) (first citing NMFS00682-83 (discussing Amendment 16 and National Standards 5 and 7); and then citing NMFS01627-29 (discussing Amendment 16 and National Standard 5)).

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 30 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 30 of 32

regardless of the weather or other dangers," in violation of National Standard 10.[118]

The Court explained that even a "cursory . . . analysis indicates that the NMFS considered National Standard No. 10 and thus discharged its duty under § 1851(a)(10)."[119]  The Court held that "[t]he fact that the measures are 'neutral,' and do not affirmatively promote safety, does not mean that they do not promote safety 'to the extent practicable.'"[120]

> The same is true here.  NMFS explained that
>
> [t]his action could have an indirect impact on commercial salmon fishing vessel safety to the extent that the cost of complying with monitoring, recordkeeping and reporting measures could reduce profit margins and therefore reduce the funds available for vessel maintenance and safety equipment. However, the use of [a vessel monitoring system] would provide another way to locate fishing vessels in the event of an emergency and may improve response and rescue time.[121]

Further, in Amendment 16's response to comments regarding National Standard 10, NMFS noted that "[t]his action also closes fishing in the Cook Inlet EEZ Area prior to the advent of deteriorating late summer and fall weather conditions."[122]  NMFS's consideration of National Standard 10 satisfies the MSA.

---

[118] *Or. Trollers*, 452 F.3d at 1123.

[119] *Id.*

[120] *Id.*

[121] NMFS02490-91.

[122] FR00057.

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 31 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 31 of 32

In sum, the Court finds that NMFS does not violate National Standards 2, 3, and 10 of the MSA or the APA in promulgating Amendment 16.

## CONCLUSION

In light of the foregoing, Plaintiffs' claims are DISMISSED with prejudice. The Clerk of Court is directed to enter a final judgment for Defendants accordingly.

DATED this 30th day of June, 2025, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:24-cv-00116-SLG, *United Cook Inlet Drift Ass'n, et al. v. Nat'l Marine Fisheries Serv., et al.*
Decision and Order
Page 32 of 32

Case 3:24-cv-00116-SLG    Document 58    Filed 07/01/25    Page 32 of 32